No. 26-1729

**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

Lou Ann Landel, on behalf of herself and all others similarly situated; Alvin L. Lewis, on behalf of himself and all others similarly situated,

*Plaintiffs-Appellants,*

v.

Olin Corporation; Olin Pension and CEOP Administrative Committee; John and Jane Does 1-10,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Missouri
Hon. Cristian M. Stevens
No. 4:25-cv-00096-CMS

# REPLY BRIEF OF PLAINTIFFS-APPELLANTS


Oren Faircloth
SIRI & GLIMSTAD LLP
100 Pearl Street, 14th Floor
Hartford, CT 06103
Telephone: (772) 783-8436
ofaircloth@sirillp.com

William H. Payne, IV
SIRI & GLIMSTAD LLP
8 Campus Drive, Suite 105, PMB#161
Parsippany, NJ 07054
Telephone: (717) 967-5529

Peter K. Stris
Rachana A. Pathak
Douglas D. Geyser
STRIS & MAHER LLP
17785 Center Court Drive N.,
Suite 600
Cerritos, CA 90703
Telephone: (213) 995-6800
Facsimile: (213) 261-0299
pstris@stris.com
rpathak@stris.com
dgeyser@stris.com

***Counsel for Plaintiffs-Appellants***

## TABLE OF CONTENTS

**Page**


TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

ARGUMENT .......... 3

I. Every tool of statutory interpretation undermines Defendants' reading of § 1055(d). .......... 3

   A. Section 1055(d)'s plain text forecloses the use of unreasonable assumptions. .......... 3

   B. Defendants' interpretation renders § 1055(d) meaningless because they concede that under their interpretation, actuarial equivalence is satisfied whenever they say it is. .......... 9

   C. Defendants' heavy reliance on other statutory provisions and *Russello* does not help them. .......... 12

   D. The Treasury regulation interpreting parallel text confirms Plaintiffs' view. .......... 18

   E. Letting sponsors pick any assumptions they want, including unreasonable ones, obviously undermines § 1055(d)'s purpose. .......... 19

   F. Remand is necessary. .......... 21

II. The district court correctly held that Plaintiffs' claims are timely. .......... 22

CONCLUSION .......... 28

CERTIFICATE OF COMPLIANCE .......... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boggs v. Boggs*,
520 U.S. 833 (1997) .......... 19

*Brady v. Nat'l Football League*,
644 F.3d 661 (8th Cir. 2011) .......... 16

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*,
536 U.S. 424 (2002) .......... 12

*Conkright v. Frommert*,
559 U.S. 506 (2010) .......... 21

*Culbertson v. Berryhill*,
586 U.S. 53 (2019) .......... 6

*Delk v. Durham Life Ins. Co.*,
959 F.2d 104 (8th Cir. 1992) .......... 26

*Drummond v. So. Co. Servs., Inc.*,
177 F.4th 1076 (11th Cir. 2026) .......... *passim*

*Duffy v. Anheuser-Busch Cos., LLC*,
449 F. Supp. 3d 882 (E.D. Mo. 2020) .......... 22

*Duncan v. Walker*,
533 U.S. 167 (2001) .......... 9

*Hankins v. Crain Automotive Holdings, LLC*,
129 F.4th 1088 (8th Cir. 2025) .......... 23

*Herndon v. Huntington Ingalls Indus., Inc.*,
No. 4:19-CV-52, 2020 WL 3053465 (E.D. Va. Feb. 20, 2020) (unpublished) .......... 22

*Lehman v. Nakshian*,
453 U.S. 156 (1981) .......... 14

*M & K Employee Solutions, LLC v. Trs. of IAM Nat'l Pension Fund*,
146 S. Ct. 1224 (2026)....6, 7, 8, 13

*Mead Corp. v. Tilley*,
490 U.S. 714 (1989)....16

*Monohon v. BNSF Railway Co.*,
17 F.4th 773 (8th Cir. 2021)....13

*New v. Dep't of Veteran Affairs*,
142 F.3d 1259 (Fed. Cir. 1998)....23, 24

*Reichert v. Kellogg Co.*,
170 F.4th 473 (6th Cir. 2026)....*passim*

*Russello v. United States*,
464 U.S. 16 (1983)....12, 15

*Smith v. Rockwell Automation, Inc.*,
438 F. Supp. 3d 912 (E.D. Wis. 2020)....22

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
531 U.S. 159 (2001)....16

*Stephens v. U.S. Airways Group, Inc.*,
644 F.3d 437 (D.C. Cir. 2011)....7, 8

*Thompson v. Gjivoje*,
896 F.2d 716 (2d Cir. 1990)....24

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001)....12

*United States v. Councilman*,
418 F.3d 67 (1st Cir. 2005)....15

*United States v. King*,
849 F.2d 1259 (9th Cir. 1988)....23

*United States v. Philidor*,
717 F.3d 883 (11th Cir. 2013)....24

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
570 U.S. 338 (2013) .......... 14

*W. Virginia Univ. Hosps., Inc. v. Casey*,
499 U.S. 83 (1991) .......... 15

*Watson v. Republican Nat'l Committee*,
146 S. Ct. 2165 (2026) .......... 6, 15

*Young v. Verizon's Bell Atl. Cash Balance Plan*,
615 F.3d 808 (7th Cir. 2010) .......... 28

**Statutes**

10 U.S.C. § 1436 .......... 17

26 U.S.C. § 401(a)(25) .......... 10, 11

29 U.S.C. § 1001(a) .......... 1

29 U.S.C. § 1055(d)(1)(B) .......... *passim*

29 U.S.C. § 1055(g) .......... 17, 20

29 U.S.C. § 1083 .......... 16

29 U.S.C. § 1084(c)(3) .......... 16

29 U.S.C. § 1102(a)(1) .......... 10

29 U.S.C. § 1108(b) .......... 20

29 U.S.C. § 1391 .......... 13

29 U.S.C. § 1399(c)(1)(A) .......... 13

49 U.S.C. § 20109(b) .......... 13

Multiemployer Pension Plan Amendments Act of 1980, Pub. L. No.
96-364 .......... 13

**Rules and Regulations**

26 C.F.R. § 1.401(a)(4)-12 .......... 21

26 C.F.R. § 1.401(a)-11(b)(2) ........ 10, 11, 18

**Other Authorities**

Amend. No. 378 to S. 4, ERISA-LH 102, 1974 WL 186672 (A.&P. L.H.) (1973) ........ 16

Am. Acad. of Actuaries, *Final Report of Joint Comm. on Pension Terminology*, 7 J. Am. Acad. Actuaries 223 (1981) ........ 7

Jeff L. Schwartzmann & Ralph Garfield, Education & Examination Comm. of the Soc'y of Actuaries, *Actuarially Equivalent Benefits* EA1-24-91 (1991) ........ 8

Soc'y of Actuaries, *Report on Actuarial Terminology for Pension Plans*, 28 Transactions Soc'y Actuaries 327 (1976) ........ 7

## INTRODUCTION

One of ERISA's "safeguards" regarding "the establishment, operation, and administration of" employee benefit plans (29 U.S.C. § 1001(a)) is that a plan must provide each married participant a "qualified joint and survivor annuity" (QJSA) that is the "actuarial equivalent of a single annuity for the life of the participant." 29 U.S.C. § 1055(d)(1)(B). As Defendants agree, the "single life annuity" (SLA) "is a monthly benefit for the participant's life," and to calculate the QJSA, a plan must "reduc[e] the SLA payments to present value and then convert[] that present value to the QJSA payments." Br. 2, 30. Defendants' unequivocal position is that, in deriving the value of this safeguard, § 1055(d) permits them to use *unreasonable* mortality tables, no matter how divorced from a realistic estimate of the participant's life.

Plaintiffs explained that every ordinary tool of statutory construction forecloses that absurd outcome. In response, Defendants trot out the very same arguments, based on the same authority, that Plaintiffs already refuted and the Sixth and Eleventh Circuits thoroughly rejected. *See Drummond v. So. Co. Servs., Inc.*, 177 F.4th 1076 (11th Cir. 2026); *Reichert v. Kellogg Co.*, 170 F.4th 473 (6th Cir. 2026).

Despite insisting that they are faithfully applying the statutory text, Defendants focus almost entirely on the two words "actuarial equivalent," taking

them in isolation and disregarding dictionary definitions. They do not explain how a married participant's QJSA could equal the value of that same participant's SLA by using mortality assumptions of people who retired decades earlier. They ascribe no meaning whatsoever to the phrase "life of the participant," effectively ignoring half the statute. They rely heavily on the *Russello* presumption and *other* statutes, yet admit that those statutes are different in structure and purpose—thereby disclaiming the critical precondition for applying *Russello*. And they refuse to engage Plaintiffs' argument that if § 1055(d) is satisfied whenever sponsors say it is, then the actuarial-equivalence requirement is meaningless. They instead turn to the Tax Code, but a separate title of the U.S. Code cannot justify rendering a provision of ERISA superfluous. In short, Defendants offer no persuasive reason to affirm and create a circuit split.

Defendants' alternative ground for affirmance—based on the Plan's limitations provision—is just as atextual. That provision appears within a multi-paragraph section entirely about benefit claims, and its plain language restricts it to claims for violations of participants' "rights under the Plan," not claims, like the ones here, that Plan terms violate ERISA. The district court correctly found it inapplicable.

Reversal is warranted.

## ARGUMENT

### I. Every tool of statutory interpretation undermines Defendants' reading of § 1055(d).

#### A. Section 1055(d)'s plain text forecloses the use of unreasonable assumptions.

Plaintiffs demonstrated that multiple aspects of § 1055's plain text forbid the use of outdated, unreasonable assumptions. In response, Defendants purport to rely on the statute's ordinary meaning, yet they all but ignore everything except the two words "actuarial equivalent." They have no answer for Plaintiffs' core interpretive position—that § 1055(d) requires a comparison to the value of the participant's SLA, which cannot be satisfied through outdated assumptions—while conceding that the foundation of that position is correct. And they cannot conjure any meaning at all for the words "life of the participant." So even were Defendants right about "actuarial equivalent," they would still lose; but they misinterpret that term, too.

**1.** Plaintiffs explained that interpreting § 1055(d) as a whole easily exposes the district court's error. The QJSA must be the "*actuarial equivalent* of a *single annuity* for the life of *the participant*." 29 U.S.C. § 1055(d)(1)(B) (emphases added). That text establishes a clear starting point for calculating the QJSA: the value of *the participant's* SLA. Once that starting point is accepted, the ending point is just as clear: The QJSA's total value must be the same as that SLA value. The problem for the district court and Defendants is that by using unreasonable, outdated

assumptions, they miscalculate the participant's SLA and thus necessarily fail to provide a QJSA with the same value as the SLA.[1] Opening Br. 19-20, 22-23.

Defendants' brief ignores Plaintiffs' argument that the text sets the SLA as the necessary comparator. They concede, however, the premise of Plaintiffs' interpretation. They admit that "[p]articipants in defined benefit plans generally receive payment as a 'single life annuity' ('SLA'), which is a monthly benefit for the participant's life," and that the QJSA must be "the 'actuarial equivalent' of the SLA." Br. 2; *see* Br. 30 (stating that plans must "reduc[e] the SLA payments to present value and then convert[] that present value to the QJSA payments"). Yet they never explain how they can accurately estimate the total value of the "monthly benefit for the participant's life" while using assumptions that are not "reasonable or current" (Br. 26).

**2.** Defendants indeed assign no meaning to the words "life of the participant" in § 1055(d). As Plaintiffs explained (Opening Br. 23-24), "'the participant' is not some hypothetical, abstract individual; it is a modern-day retiree. Accurately estimating the lifespan of the relevant participant, therefore, necessarily requires the use of mortality data reasonably reflecting the life expectancy of a retiree living in the present day." *Reichert*, 170 F.4th at 482. While Defendants call that interpretation

[1] Annuities are routinely valued before they commence, so Defendants are wrong to claim that "the total value … can only be determined after the [participant's] lifetime." Br. 37.

"strained," their interpretation of these words is nonexistent. Br. 32-33. But a viable statutory construction cannot ignore half the operative provision.

And Defendants' attacks are easily refuted. They say that it is "impossible" to satisfy Plaintiffs' interpretation because a plan would need to change its assumptions "every time a participant retires" and "examin[e] the characteristics of each retiring participant." Br. 33. But Defendants wrongly read "the life of the participant" in isolation. Section 1055(d) requires "the actuarial equivalent of" the SLA, and an actuary would find a range of assumptions permissible to determine the value of any participant's SLA. As such, no reasonable actuary in this context would say it is impermissible to use generalized assumptions (if they are accurate) about the employee base rather than individualized assessments. Put another way, a plaintiff could not win by claiming that her preferred assumptions merely result in higher benefits than what the plan used; rather, she must prove that the plan's assumptions are *un*reasonable. The Sixth and Eleventh Circuits understood this, explaining (like Plaintiffs) that § 1055(d) permits a "range" of assumptions. *Drummond*, 177 F.4th at 1105; *Reichert*, 170 F.4th at 483.

Accordingly, Defendants lose even accepting their interpretation of "actuarial equivalent." Their entire argument boils down to the contention that "[t]he term 'actuarial equivalent' simply means that benefits must be calculated using the same stated assumptions." Br. 12 (heading formatting removed). But they disregard the



Appellate Case: 26-1729 Page: 11 Date Filed: 09/21/2026 Entry ID: 5686223

fact that § 1055(d) constrains those assumptions by requiring that they accurately measure the total value of a participant's SLA. Again, Defendants ignore half the statute.

**3.** Defendants are also wrong, however, about the meaning of "actuarial equivalent" itself. Dictionary definitions, actuarial literature, and caselaw show that the term demands that assumptions be reasonable and current. Opening Br. 25-29. Defendants barely grapple with those sources. They entirely ignore Plaintiffs' dictionary definitions, although dictionaries are the standard first-line tool for determining ordinary meaning. *See, e.g.*, *Watson v. Republican Nat'l Committee*, 146 S. Ct. 2165, 2172 (2026); *M & K Employee Solutions, LLC v. Trs. of IAM Nat'l Pension Fund*, 146 S. Ct. 1224, 1230 (2026); *Drummond*, 177 F.4th at 1095-1096 & n.25 (citing *Culbertson v. Berryhill*, 586 U.S. 53, 59 (2019)).[2]

Defendants' response to Plaintiffs' actuarial literature only concedes that Plaintiffs' sources are on point. They write that "actuarial practice may require 'reasonable' or current data when *selecting* assumptions," but "this standard does not apply when *applying* plan assumptions." Br. 44. But the issue here is entirely about which assumptions ERISA lets a plan select. Defendants frame their argument the same way: "Congress allowed employers to *select assumptions* that must be

[2] Defendants later allude (at 47) to the *Reichert* dissent's reliance on dictionary definitions, without acknowledging those are the definitions that support Plaintiffs. *See* Opening Br. 28-29.

specified in the plan." Br. 23 (emphasis added); *see, e.g.*, Br. 7 ("Congress … [did not] regulat[e] what assumptions are used, leaving that *choice* for employers to define in their plans.") (emphasis added). It is thus a mystery why Defendants think it helpful to call actuarial assumptions "'tools'" for making the § 1055(d) calculation. Br. 13, 51 (quoting *M & K*, 146 S. Ct. at 1230). Plaintiffs' position is that § 1055(d) regulates those tools. *See, e.g.*, *Reichert*, 170 F.4th at 483 ("[I]f the assumptions selected by an employer do not *reasonably* reflect the life expectancy of its plan participants, that employer has exceeded the scope of actuarial acceptability and failed to adhere to § 1055(d)'s actuarial equivalence requirement.").

Defendants' critique of Plaintiffs' choice of sources is thus irrelevant, though it is also wrong. They say the Court should not consult "'extratextual sources'" like "'industry sources'" at all. Br. 42 (citation omitted). This is bizarre—Defendants' own effort to interpret "actuarial equivalent" (without turning to other statutes) relies exclusively on industry sources. *See* Br. 12-13, 42-43 (citing Soc'y of Actuaries, *Report on Actuarial Terminology for Pension Plans*, 28 Transactions Soc'y Actuaries 327, 329 (1976); Am. Acad. of Actuaries, *Final Report of Joint Comm. on Pension Terminology*, 7 J. Am. Acad. Actuaries 223, 236 (1981)). Even the definition from *Stephens v. U.S. Airways Group, Inc.* comes from an industry source. 644 F.3d 437, 440 (D.C. Cir. 2011) (citing Jeff L. Schwartzmann & Ralph Garfield, Education

& Examination Comm. of the Soc'y of Actuaries, *Actuarially Equivalent Benefits* 1, EA1-24-91 (1991)).

On that note, the sources used by both *Stephens* and *M & K* were both cited by Plaintiffs as supporting their position. *Compare Stephens*, 644 F.3d at 440 (citing Schwartzmann & Garfield) *and M & K*, 146 S. Ct. at 1231 (citing Actuarial Standard of Practice No. 27), *with* Opening Br. 27-28. Defendants' own cases thus endorse Plaintiffs' sources as pertinent.

As to Defendants' industry sources, they get them nowhere for the reasons already discussed. In rejecting reliance on the same quotation from the Society of Actuaries' report, the Eleventh Circuit explained that these statements "don't show what Defendants need—that two annuities are actuarially equivalent even if they can be equated only by using patently outdated, unrealistic, or even totally arbitrary assumptions." *Drummond*, 177 F.4th at 1093.[3]

Defendants' only other authority on "actuarial equivalent"—"expert testimony" in summary judgment orders—is even less useful. Br. 45. Testimony in other cases has nothing to do with statutory interpretation on a motion to dismiss in this case. *See Drummond*, 177 F.4th at 1093 & n.21.

---

[3] Defendants' sources were cited to the Sixth and Eleventh Circuits. *See* R. Doc. 72 at 1-2, No. 24-12773 (11th Cir. Sept. 15, 2025); R. Doc. 55 at 5-6, No. 24-5945 (6th Cir. May 23, 2025).

Defendants' position and the district court's holding are irreconcilable with every part of the statutory text.

### B. Defendants' interpretation renders § 1055(d) meaningless because they concede that under their interpretation, actuarial equivalence is satisfied whenever they say it is.

In addition to violating § 1055(d)'s plain language, Defendants' and the district court's interpretation impermissibly renders the actuarial equivalence requirement "insignificant, if not wholly superfluous." *Duncan v. Walker*, 533 U.S. 167, 174 (2001); *see* Opening Br. 29-31. That is because, as Defendants admit, their view means that Congress set no limits on "what assumptions are used, leaving that choice for employers to define in their plans." Br. 7; *see, e.g.*, Br. 15. That admission is fatal. As the Sixth and Eleventh Circuits (and multiple district courts) recognized, if "employers would have full discretion in determining the actuarial assumptions used," that "would render the text of § 1055(d)(1)(B) meaningless." *Reichert*, 170 F.4th at 484; *see Drummond*, 177 F.4th at 1096 ("Interpreting 'actuarial equivalent' to allow employers to calculate retirement benefits using any assumptions they please would leave the term insignificant, at most.").

Defendants declare this conclusion wrong, but they entirely fail to engage with its reasoning. Br. 36-38. They assert that § 1055 "guarantee[d] surviving spouses a *new* substantive right to receive annuity payments." Br. 36. But if plans can calculate those payments however they want—including, as Defendants



Appellate Case: 26-1729 Page: 15 Date Filed: 09/21/2026 Entry ID: 5686223

concede, with unreasonable assumptions (*e.g.*, Br. 14-15, 16)—then plans could calculate this "right" with a value of zero dollars. That conclusion is not affected by the fact that plans must use the *same* assumptions to calculate the QJSA and the SLA and that the plan must specify those assumptions. *E.g.*, Br. 12-16. A plan could still choose any assumptions it wants, depriving § 1055(d) of meaning.[4]

Since Defendants cannot imbue § 1055(d) with meaning, they turn to the Internal Revenue Code. They invoke 26 U.S.C. § 401(a)(25), which requires that assumptions be specified in the plan, and 26 C.F.R. § 1.401(a)-11(b)(2)'s tax-qualification standards, which require "reasonable actuarial factors." Br. 38-39. But IRC provisions cannot give meaning to Defendants' interpretation of § 1055(d). That the IRS can enforce a different statute is no substitute for a participant's claim under ERISA. Federal (and state) laws often target the same conduct, but those parallel constraints do not mean that the judiciary can strike one from the books. That is especially true where, as here, the claimants and available remedies are distinct.

Far from helping Defendants, these provisions undermine their interpretation. Section 401(a)(25) is part of a "disclosure regime" along with 29 U.S.C. § 1102(a)(1), which also "requires employers to disclose plan terms in writing." *Reichert*, 170 F.4th at 485. "Given this preexisting disclosure regime, Defendants'

[4] Defendants argue that Congress did not require "'that pension plans provide *maximum* available benefits.'" Br. 37 (citation omitted). This is a strawman. Plaintiffs have never demanded "maximum" benefits.

attempt to construe § 1055(d)(1)(B) as a mere disclosure requirement would impermissibly render the provision entirely superfluous." *Id.*; *see* Opening Br. 45. Moreover, § 401(a)(25) "wasn't added to the Tax Code until 10 years after Congress created the actuarial-equivalent requirement. Later-in-time legislation can't explain why Congress would write a meaningless provision years earlier." *Drummond*, 177 F.4th at 1096 (citation omitted).

And Defendants' reliance on § 1.401(a)-11(b)(2) is another concession. They apparently agree that IRC provisions imposing parallel requirements to § 1055 require reasonable actuarial assumptions when calculating JSA payments. As Plaintiffs explained, § 1055(d) should be interpreted consistently with §§ 401(a) and 417(b). Opening Br. 6 n.4, 32-33; *see infra* p.18. And, again, the fact that a different title of the U.S. Code requires reasonableness does not allow § 1055(d) to be meaningless.

Defendants finally suggest that it is unrealistic that a plan would use centuries-old mortality data, so the Court may disregard that possibility. Br. 8-9, 38, 48. This misses the point—if an interpretation lets plans use any assumptions they want, then the interpretation is not plausible. Moreover, "[p]lans could simply use mortality assumptions that are just as unrealistic as the 1789 mortality tables but phrased in less obvious terms." *Drummond*, 177 F.4th at 1096. And even if Defendants did not use centuries-old data, they did use data sufficiently outdated to deprive participants

of the benefits ERISA secured them. While a few hundred dollars per month might not seem like much to Defendants, that is critical income to the ordinary retiree.

Ultimately, if § 1055(d) is satisfied as long as the assumptions used to calculate JSA payments are written in the plan, then it provides no protection at all. Defendants' interpretation "would in practical effect render [§ 1055(d)] entirely superfluous." *TRW Inc. v. Andrews*, 534 U.S. 19, 29 (2001).

### C. Defendants' heavy reliance on other statutory provisions and *Russello* does not help them.

Unable to meaningfully interpret § 1055(d)'s own text, Defendants look everywhere but § 1055(d) for help. They heavily emphasize the presumption that "'[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" Br. 16 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). But as Plaintiffs explained, this canon is inapplicable here and regardless is only a presumption, which supports Plaintiffs equally. Opening Br. 39-45.

Defendants' reliance on *Russello* fails at the outset because they concede that its preconditions are absent here. As Plaintiffs explained (at 42-44), "this presumption does not apply when the sections are dissimilar, with different language and different formulations addressing different circumstances." *Reichert*, 170 F.4th at 486 (citing *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424,



Appellate Case: 26-1729 Page: 18 Date Filed: 09/21/2026 Entry ID: 5686223

435-436 (2002)). Defendants confess exactly that about the provisions they cite: "[E]ach section has a different structure and purpose." Br. 28; *see id.* ("Congress treated each section differently precisely because their different problems require different approaches."). Defendants' dissertation on other enactments is therefore pointless by their own admission. These other provisions use different language in different structures for different purposes.

None of Defendants' cases detract from that conclusion. Take their two principal cases using *Russello*. In *M & K Employee Solutions*, the relevant sections of ERISA worked together to address employer withdrawal liability and were enacted in the same legislation (Multiemployer Pension Plan Amendments Act of 1980, Pub. L. No. 96-364, § 104). *See* 146 S. Ct. at 1228. The comparator statute, 29 U.S.C. § 1399(c)(1)(A), even explicitly cross-referenced one of the statutes the Court was interpreting, *id.* § 1391. Those provisions' tight links bear no resemblance to the "different problems requir[ing] different approaches" here. Br. 28. The same goes for *Monohon v. BNSF Railway Co.*, 17 F.4th 773 (8th Cir. 2021). The two provisions there appeared in the same subsection and addressed anti-retaliation protections. The comparator provision (49 U.S.C. § 20109(b)(2)) expressly carved out the provision that this Court was interpreting, *id.* § 20109(b)(1)(A), so of course that carveout was informative. *See id.* § 20109(b)(2) (providing different rule for anti-retaliation provisions § 20109(b)(1)(B) and (C) but not subparagraph (A)).

Moreover, in both decisions, the *Russello* presumption was just one tool that was consistent with the statute's plain meaning, unlike here, where Defendants' *Russello* argument conflicts with § 1055(d)'s text and renders it meaningless. *See* Opening Br. 41-42.

Defendants' overview of ERISA amendments (Br. 22-28) is useless for the same reasons, for these amendments involve the same statutes that Defendants concede are unhelpful. And their cases here are distinguishable along the same lines as their *Russello* cases. For instance, in *Lehman v. Nakshian*, 453 U.S. 156 (1981), the relevant amendment also revealed an express carveout, "clearly emphasiz[ing] that [the statute at issue] was self-contained and unaffected by other sections." *Id.* at 168. So it was obvious that Congress deliberately refrained from including that amendment's change in the statute at issue. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353-354 (2013) ("[A] different portion of the 1991 Act contains an express reference to all unlawful employment actions, thereby reinforcing the conclusion that Congress acted deliberately when it omitted retaliation claims from § 2000e–2(m)."). There is nothing remotely similar to glean here from Congress's ERISA amendments over the decades, given the various sections' different language, structure, and purpose.

Defendants criticize distinguishing other provisions on the basis that they "post-dated Sections 1055(d)-(e)" because, Defendants say, both the current and



Appellate Case: 26-1729 Page: 20 Date Filed: 09/21/2026 Entry ID: 5686223

prior legal regimes matter. Br. 26-27 (citing *W. Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100 (1991) and *Watson*, 146 S. Ct. at 2177 n.8). Defendants confuse general principles of statutory interpretation with *Russello*'s logic, namely, the fiction of congressional intent that "assumes that Congress acts carefully and deliberately in including terms in one part of a statute and omitting them in another." *United States v. Councilman*, 418 F.3d 67, 74 (1st Cir. 2005). The time gap is plainly relevant to the *Russello* presumption—"*Russello* itself cautions that 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" *Drummond*, 177 F.4th at 1101 (quoting *Russello*, 464 U.S. at 26).

By contrast, Defendants' cases stand only for the unremarkable proposition that a statute must be interpreted in context "of both previously and subsequently enacted law." *W. Virginia Univ.*, 499 U.S. at 100. Of course context matters. *See* Opening Br. 21 (explaining that the Court interprets statutes in accordance with statutory context). For instance, a provision should not be superfluous either when enacted or after a later enactment. But it is Defendants who violate this principle. Their "[l]ater-in-time legislation can't explain why Congress would write a meaningless provision years earlier." *Drummond*, 177 F.4th at 1096. Plaintiffs' interpretation of § 1055(d) fits comfortably within ERISA at all times. Again, Defendants effectively concede as much by acknowledging the various provisions' different functions. In any event, even were Defendants correct, the time gap was

just one basis for dismissing *Russello*; all the other problems with Defendants' reliance on that presumption would remain.

Defendants do cite a few new provisions, which Plaintiffs did not cover already in their opening brief. But these suffer the same problems. One, in a string cite, Defendants include 29 U.S.C. § 1084(c)(3). Br. 18. But as their string cite shows, that provision resembles 29 U.S.C. § 1083—it uses similar terminology and addresses plan funding—which Plaintiffs did discuss.

Two, Defendants claim that "Congress considered but rejected an amendment … that would have required QJSAs to be computed 'in accordance with reasonable actuarial methods approved by the Secretary.'" Br. 22-23 (quoting Amend. No. 378 to S. 4, ERISA-LH 102, 1974 WL 186672, *1 (A.&P. L.H.) (1973)). But "'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent" (*Mead Corp. v. Tilley*, 490 U.S. 714, 724 (1989) (citation omitted)), for "[a] bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001); *see, e.g.*, *Brady v. Nat'l Football League*, 644 F.3d 661, 679 n.7 (8th Cir. 2011).[5] The amendment also didn't include "actuarial equivalent" and was less flexible than § 1055(d), in that it required adherence to the Secretary's

[5] There is no indication that Congress "considered but rejected" the language Defendants quote.

regulations. *Cf.* Opening Br. 43; *Reichert*, 170 F.4th at 486 (§ 1055(d) "confers on plan actuaries *reasonable* discretion in their selection of mortality data, which differentiates § 1055(d) from provisions like § 1055(g) that mandate the use of particular interest rates and mortality tables").

Three, Defendants trumpet (at 23) a 1956 enactment that provided an annuity for servicemembers. *See* 10 U.S.C. § 1436 (1956), 70A Stat. 1, 110. Just like 29 U.S.C. § 1055(g), however, this provision "mandate[s] the use of particular interest rate and mortality tables" instead of, like § 1055(d), granting plans "*reasonable* discretion." *Reichert*, 170 F.4th at 486. Again, Defendants' new examples, like their old ones, are too different for a useful comparison.

Finally, Defendants ignore Plaintiffs' argument that "the *Russello* presumption cuts in [participants'] direction." *Drummond*, 177 F.4th at 1103. Congress knew how to specify that assumptions must be "specified in the plan." Br. 7; *see* Opening Br. 44-45. "The upshot [under *Russello*] would be clear: Congress didn't want [courts] to base the meaning of 'actuarial equivalent' on whatever assumptions a plan wrote into its terms." *Drummond*, 177 F.4th at 1103. The Court should not "accept reasoning that boils down to 'presumption for me, but not for thee.'" *Id.*

Defendants' featured legal principle is thus at best for them a draw. But only Plaintiffs' interpretation preserves each word of § 1055(d).

### D. The Treasury regulation interpreting parallel text confirms Plaintiffs' view.

Defendants lack a persuasive response to the Treasury regulation providing that "reasonable actuarial factors" must support actuarial equivalence. Treas. Reg. § 1.401(a)-11(b)(2); *see* Opening Br. 32-33. Defendants concede that this regulation, which interprets IRC language materially identical to § 1055(d), reflects a reasonableness requirement. Br. 41. Yet they fail to explain why it is sensible to interpret that identical ERISA terminology to authorize something that causes a plan to lose its favorable tax treatment. Their silence is particularly jarring given their repeated emphasis on the importance of tax qualification.

Defendants think that the fact that the regulation requires reasonableness means that reasonableness cannot be required by the statute, otherwise the regulation's "use of 'reasonable' would be superfluous." Br. 41. They misunderstand the regulation. As explained, Treasury simply highlighted plans' flexibility under the statute: plan sponsors may use generalized assumptions, as long as they are reasonable. *See* Opening Br. 32 & n.8. The Sixth and Eleventh Circuits correctly found this regulation persuasive.[6]

---

[6] The *Reichert* dissent unsuccessfully tried Defendants' same argument. *See* 170 F.4th at 497.



Appellate Case: 26-1729 Page: 24 Date Filed: 09/21/2026 Entry ID: 5686223

### E. Letting sponsors pick any assumptions they want, including unreasonable ones, obviously undermines § 1055(d)'s purpose.

Plaintiffs also demonstrated that the district court's decision thwarts § 1055's purpose, namely, "to ensure a stream of income to surviving spouses." *Boggs v. Boggs*, 520 U.S. 833, 843 (1997). Using outdated assumptions when calculating JSA payments results in JSAs with aggregate values that are less than—not equivalent to—the aggregate values of SLAs. This penalizes married participants or incentivizes them to decline the JSA entirely. Opening Br. 35-38.

Defendants confirm Plaintiffs' assessment of the statutory purpose. Br. 36-37. But they insist that Congress nevertheless "did not legislate how [QJSAs] must be calculated," instead letting plans select any assumptions they want. Br. 37. Their "propos[ition] that Congress allowed a *plan* to undermine a spouse's entitlement by using unreasonable actuarial assumptions to shrink the monthly survivor annuity payment" is "inexplicable." *Drummond*, 177 F.4th at 1098.

Defendants' only real effort to resist is arguing that out-of-date, unreasonable assumptions might unintentionally benefit participants because "[m]ortality rates are impacted by current events" (Br. 37), like COVID-19 (Br. 34). But Congress would have been focused on the most common circumstances, not rare exceptions like a once-in-a-generation pandemic. Unlike Defendants' position, "[r]ecognizing that § 1055(d)(1)(B) imposes substantive obligations regarding the actuarial assumptions used by employers and their pension plans helps satisfy the statutory obligation of



Appellate Case: 26-1729 Page: 25 Date Filed: 09/21/2026 Entry ID: 5686223

the fiduciaries to protect the pension payments promised to married couples by providing 'a stream of income to surviving spouses.'" *Reichert*, 170 F.4th at 487 (citation omitted).

ERISA's legislative history reinforces that conclusion. Opening Br. 34-35. Congress intended § 1055(d) to supply a real standard, not to let sponsors say it is satisfied at their whim. Defendants ignore this consistent history.

Since Defendants cannot plausibly argue that their position aligns with *Boggs* and § 1055's purpose, they retreat to broader policy arguments. They assert that preventing them from using unreasonable assumptions will be too burdensome and undermine predictability. Br. 8, 30-31. Defendants overstate this burden. Nobody is asking plans for "continuous[]" updates. Br. 7, 8, 14, 31, 34, 37, 40. Mortality trends change only gradually, and, as discussed, "reasonableness" portends a range of permissible assumptions. Nor is "reasonableness" an unusual or draconian requirement. Such standards pervade the law, including ERISA. *See, e.g.*, *Reichert*, 170 F.4th at 487; 29 U.S.C. §§ 1108(b)(2)-(4), (6). Moreover, plans already must track mortality assumptions and interest rates for other provisions, so they are aware of any discrepancy between current assumptions and the ones they use to calculate JSA payments. And if plans wanted, they could pick the mortality tables and interest rates from § 1055(g). Likewise, Defendants are wrong that updating assumptions will violate ERISA's anti-forfeiture rules. Br. 31, 35. Using § 1055(g) avoids this

entirely, or plans could specify a "higher of" benefit option.[7] Multiple courts have adopted Plaintiffs' interpretation, yet Defendants (or any amici) do not offer any examples of negative consequences. Their concerns about administrative burden are illogical and unfounded.

In any event, even the desire to "ensure predictable liabilities" must be "view[ed] … in light of Congress's overarching ambition to 'ensure that employees would receive the benefits they had earned.'" *Drummond*, 177 F.4th at 1104 (quoting *Conkright v. Frommert*, 559 U.S. 506, 516 (2010)). It does not "serve[] this goal to let plans transform annuities into a form that is worth far less than the benefit a worker earned." *Id.*

**F. Remand is necessary.**

Because the district court misinterpreted § 1055(d), remand is necessary for discovery on the merits: specifically, whether Defendants' assumptions fall outside the range of reasonableness. Defendants contend that "this Court should find that Olin's assumptions are reasonable," (Br. 51), but there is no conceivable basis for the Court to make that factual determination. Although Defendants note that their mortality table appears in 26 C.F.R. § 1.401(a)(4)-12's definition of a "[s]tandard mortality table," that definition is expressly limited to Treasury's nondiscrimination regulations and cannot establish that the Plan's assumptions are reasonable as a

[7] Defendants' argument suggests they think they could *never* update assumptions.

matter of law under § 1055(d). *See, e.g.*, *Duffy v. Anheuser-Busch Cos., LLC*, 449 F. Supp. 3d 882, 890-891 (E.D. Mo. 2020); *Herndon v. Huntington Ingalls Indus., Inc.*, No. 4:19-CV-52, 2020 WL 3053465, at *3 (E.D. Va. Feb. 20, 2020) (unpublished); *Smith v. Rockwell Automation, Inc.*, 438 F. Supp. 3d 912, 924 (E.D. Wis. 2020). Plaintiffs have plausibly alleged that their QJSAs do not satisfy § 1055(d), and remand for discovery is plainly necessary.

## II. The district court correctly held that Plaintiffs' claims are timely.

As an alternative ground for affirmance on Plaintiffs' claims for violations of ERISA, Defendants contend that the district court erred in rejecting their defense based on the Plan's two-year limitations period. That limitations provision is buried in the middle of a paragraph about benefit claims, in the middle of a section about benefit claims. It provides:

> In addition to this six month deadline that applies to filing a lawsuit after the claims and appeals procedures are exhausted, a general time limitation shall apply to all lawsuits involving all types of Plan issues. An individual must commence any such lawsuit involving Plan claims no later than two years after the individual first receives information that constitutes a clear repudiation of the rights the individual is seeking to assert (i.e., the underlying event or issue that should have triggered the individual's awareness that his or her rights under the Plan may have been violated).

JA118; R. Doc. 21-1, at 60 (§ 10.1(e)). The district court held that this provision did not apply because it governs only claims for violations of "rights under the Plan," whereas "Plaintiffs claim that the Plan as written violates the guarantees of ERISA,"



Appellate Case: 26-1729 Page: 28 Date Filed: 09/21/2026 Entry ID: 5686223

namely 29 U.S.C. § 1055's actuarial-equivalence requirement. JA586; R. Doc. 32, at 7. The court correctly interpreted this language.

**A.** The Plan is interpreted under federal common law. *Hankins v. Crain Automotive Holdings, LLC*, 129 F.4th 1088, 1093 (8th Cir. 2025). The Court gives words "their plain and ordinary meaning," "consider[s] the entire" Plan, and "read[s] words in context." *Id.* (citations omitted).

The limitations provision's plain meaning shows that it does not apply to Plaintiffs' claims for violating ERISA. "Plan claims" are "claims" under the "Plan." The parenthetical at the end of that sentence makes this clear: "(i.e., the underlying event or issue that should have triggered the individual's awareness that his or her rights under the Plan may have been violated)." As the district court recognized, the phrase "rights under the Plan" excludes claims for violations of ERISA.

Defendants argue that this parenthetical "only appears in the context of when the claim accrues and does not restrict the applicability of the limitation period." Br. 54. But they ignore the function of the "i.e." abbreviation. That abbreviation "introduces another way ... of putting what has been already said," *i.e.*, it "restate[s]" what came before. *United States v. King*, 849 F.2d 1259, 1260 (9th Cir. 1988). Contrary to Defendants' assertion, the term thereby serves to "restrict[]" the meaning of the phrase to which it is attached. *New v. Dep't of Veteran Affairs*, 142 F.3d 1259, 1265 (Fed. Cir. 1998). For instance, *New* considered a regulation that provided:



Appellate Case: 26-1729 Page: 29 Date Filed: 09/21/2026 Entry ID: 5686223

"'Where an employee has been offered suitable employment ... by the employing agency (i.e., employment ... which the [OWCP] has found to be within the employee's ... capabilities ... [and] limitations),' the employee is obligated to return to work." *Id.* (alterations in original) (quoting the regulation). One party argued that "the regulation's mention of the OWCP's finding of suitability is merely exemplary and is not a limitation on what constitutes suitable employment." *Id.* The court rejected that position because it could not be squared with the meaning of "i.e.," which "intentionally restricted the term 'suitable employment'" to the parenthetical phrase prefaced by "i.e." *Id.*; *see also, e.g.*, *United States v. Philidor*, 717 F.3d 883, 886 (11th Cir. 2013) (interpreting phrase "an actual (i.e., not fictitious) individual" to mean that "not fictitious was the exclusive definition for 'actual'" because "'i.e.' means 'that is'"); *Thompson v. Gjivoje*, 896 F.2d 716, 723 (2d Cir. 1990) (holding that "i.e." qualifier "preclude[d] any other interpretation").

Accordingly, paragraph (e) effectively reads as requiring an individual to commence suit "no later than two years after the underlying event or issue that should have triggered the individual's awareness that his or her rights under the Plan may have been violated." That unambiguously restricts the limitations period to claims for violations of Plan terms.

Context confirms this interpretation. The surrounding provisions all cover claims for benefits under the Plan. The limitations period appears within paragraph

(e) of § 10.1, which is titled "Benefit Claims Procedures." JA115; R. Doc. 21-1, at 57; *see* JA118; R. Doc. 21-1, at 60. Section 10.1 begins with multiple paragraphs detailing procedures for "[c]laims for benefits." JA115; R. Doc. 21-1, at 57 (§ 10.1(a)); *see* JA115-118; R. Doc. 21-1, at 57-60 (§ 10.1(b)-(d)) (each paragraph discussing "claim for benefits"). Even within paragraph (e), the limitations language is tucked between provisions that specifically circumscribe claims for benefits. That paragraph begins by referencing the exhaustion requirement for lawsuits "challenging a claim denial." JA118; R. Doc. 21-1, at 60. Then the first sentence after the limitations period discusses "the claims procedure" for "a claim for benefits." *Id.* And the paragraph ends the way it began, with another unambiguous limit on a benefits claim: "In order to raise an issue in any legal action related to the claim, an individual must have clearly raised such issue during *the claims and appeals procedure* described above." *Id.* (emphasis added). Defendants' position means that the Plan drafters wrote an entire multiple-paragraph section focused entirely on benefit claims, except, in two sentences in the middle of one paragraph, hid a limitations period that restricts all claims having anything to do with the Plan. That is implausible.

Defendants' near-exclusive reliance on the words "Plan issues" cannot override all the textual evidence pointing the other way. That sentence does not even provide a specific limitations period; it just states that there will be some limitations

period: "[A] general time limitation shall apply to all lawsuits involving all types of Plan issues." JA118; R. Doc. 21-1, at 60. To learn what the period is, the reader must move to the next sentence. And as explained, that sentence confines itself to claims asserting that an individual's "rights *under the Plan*" were violated. The Plan likely says "all types of Plan issues" here because some of the preceding sections sometimes distinguished benefit claims due to disability.

At minimum, the limitations period's scope would be ambiguous. But that would also require affirmance. "As a matter of federal common law," if an ambiguity remains "after applying ordinary principles of construction," "a court construing plans governed by ERISA should construe ambiguities against the drafter." *Delk v. Durham Life Ins. Co.*, 959 F.2d 104, 106 (8th Cir. 1992). Plaintiffs, of course, had no part in drafting the Plan. The district court thus correctly interpreted the limitations period regardless.[8]

Defendants try to save themselves by contending that they should win even under the court's interpretation. They say Plaintiffs' "lawsuit involves [their] 'rights under the Plan' because the Plan provides" for an actuarially equivalent QJSA, yet "Plaintiffs allege that the assumptions in the Plan do not create an actuarially equivalent QJSA." Br. 54. This is nonsense. Under the court's plain-language

[8] Defendants did not argue in the district court or here that their interpretation of the Plan is owed deference. They have thus waived this argument.

interpretation, the limitations period applies not to lawsuits that "involve[]" rights under the Plan (*id.*), but to *violations* of those rights. And Plaintiffs "do not claim that their rights under the Plan have been violated. Rather, Plaintiffs claim that the Plan as written violates the guarantees of ERISA … ." JA586; R. Doc. 32, at 7. The only reason that "the Plan do[es] not create an actuarially equivalent QJSA" (Br. 54) is because it violates § 1055. That is, without ERISA's actuarial equivalence requirements, Plaintiffs would have no claim.

Defendants falsely assert that "Plaintiffs *agreed* that the Plan's 'two-year limitation period' applies." Br. 54 (quoting R. Doc. 24, at 2 (Plaintiffs' opposition to motion to dismiss)). In the same paragraph Defendants quote, Plaintiffs *also* made the exact argument the district court adopted: "[T]he Plan's limitations provision applies to 'claims for benefits under the Plan,' and Plaintiffs bring no such claim. They challenge the legality of the Plan's terms under ERISA, not their application in determining benefits." R. Doc. 24, at 3. That holding should be affirmed.

**B.** Defendants' interpretation of the limitation provision is irreconcilable with its plain language. Should the Court disagree, however, it should not direct dismissal but should instead remand to "address Plaintiffs' accrual argument" (Br. 55): that within the two-year time bar, Plaintiffs did not "receive[] information that constitutes a clear repudiation of the rights [they are] seeking to assert." As Defendants

acknowledge, the district court did not address this argument. Br. 55. This Court need not address it in the first instance.

Defendants nevertheless assert that the Court should find that Plaintiffs' accrual argument fails as a matter of law. *Id.* But if this Court does decide to consider this question on first view, the only plausible conclusion is the opposite. Even assuming that (1) constructive knowledge, rather than actual knowledge, triggers the running of the Plan's limitation period; and (2) Plaintiffs "received" the precise mortality table and interest rate underlying their QJSA calculations, their claims did not accrue when they were provided with that information. Actuarial calculations are required to determine whether a participant's QJSA has a lower present value than their SLA. The unreasonable assumptions do not put ordinary participants on notice of the actuarial equivalence violation, much less provide the "clear repudiation" that is required to trigger the Plan's statute of limitations. *Cf. Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 816 (7th Cir. 2010) ("nothing suggests that the $286,095 payment that Young received should have been a red flag that she was underpaid").

## CONCLUSION

The Court should reverse the district court's order dismissing Plaintiffs' complaint, affirm its ruling rejecting Defendants' limitations defense, and remand for further proceedings on the merits of Plaintiffs' claims.



Appellate Case: 26-1729 Page: 34 Date Filed: 09/21/2026 Entry ID: 5686223

DATED: September 21, 2026

Respectfully submitted,

**STRIS & MAHER LLP**

*/s/ Rachana Pathak*

Rachana A. Pathak

Attorneys for Plaintiffs-Appellants

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) and Circuit Court Rule 32-1 because it contains 6,488 words, excluding the parts of the brief exempted by the Federal Rule of Appellate Procedure 32(f).

Undersigned counsel certifies that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced 14-point Times New Roman typeface using Microsoft Office 365.

In accordance with this Circuit's Rule 28A, I also certify that the electronic version of this document was scanned for viruses with Sophos Endpoint Agent 2026.1.0.1681.0, Sophos Limited and found free of viruses.

DATED: September 21, 2026

Respectfully submitted,

**STRIS & MAHER LLP**

*/s/ Rachana Pathak*
Rachana A. Pathak

Attorneys for Plaintiffs-Appellants

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 21, 2026

Respectfully submitted,

**STRIS & MAHER LLP**

*/s/ Rachana Pathak*
Rachana Pathak

*Attorney for Plaintiffs-Appellants*